We'll hear argument next in Case No. 10-545, Golan v. Holder. Mr. Falzoni. Thank you, Mr. Chief Justice. May it please the Court. Section 514 did something unprecedented in American copyright law. It took millions of works out of the public domain where they had remained for decades as the common property of all Americans. That violated the Copyright Clause and the First Amendment. Let me turn first to the Copyright Clause. In Eldred, this Court held Congress gets to pick the date on which a copyright expires, and it can extend that date before we reach that date. Congress can set a time limit. In this case, we're dealing with, let's say, Aaron Copland, who gets the benefit of copyright, and Congress says, You know, we think Shostakovich should be treated just like Copland. Yeah, we took care of our own when we weren't part of the world community, but now we are. And so all that Congress is doing is giving Shostakovich works the same limited time as Aaron Copland. And why does that violate the limited time prescription? The problem is Congress is now setting a second limit long after the first one has come and gone. But the first the person we're talking about, the work we're talking about, never got the first limit. There was no, there was no time. There was no time when that work could have been protected. So why isn't it consistent with the Copyright Clause to say you are entitled to limited time protection? We're not talking about a case where you've had the protection, enjoyed it, and then it expired, and then Congress says, we like your work so much, we're going to give you another term. What's affected here are people who were unprotected, and Congress says we think that they should have a limited time. So let me just clarify one thing. Many of the works that were restored here did get some time, 28 years, and were not renewed. But to get back to your question about the works that got none? They didn't get the equivalent of what a U.S. author. But let's take the large category, because it's the ones that you featured. You're talking about Shostakovich, Stravinsky. And I say, well, what's wrong with giving them the same time that Aaron Copland got? Congress has been setting the limited time at zero since 1790. In the 1790 Act, Congress set the limit at zero for a wide array of works. Those that did not comply with formalities, those that were written by foreign authors. But that's not a time. That's saying you have no time. Well, but saying you have no time is itself picking the limit, because the language of the Copyright Clause forces Congress to pick a limit that constrains copyright by marking its end. And when — if a limit does not mark the end once reached, then there is no limit. But it has to have a beginning, too. And that's — for these people who were unprotected because we didn't recognize that copyright, there's no beginning. No, there does not need to be a beginning. It is within Congress's discretion. Remember, this is permissive. Congress may grant exclusive rights, but it can also say your limit is going to be zero. We decide that you're not going to get the exclusive rights. And every Congress since 1790, every time it went to add subject matter, every time it went to extend the duration of copyright, respected that choice to give no time. And, in fact, the time — the decision to make foreign authors ineligible is a decision that Congress has never gone back on. None of the exceptions the government points to remove anything from the public domain that was placed there based upon a lack of national eligibility. Two hundred years of history is crystal clear about — Ginsburg. I can understand your argument that the public domain is untouchable. I'm not sure I get that from the Constitution that says to secure to authors for a limited time. The exclusive right. That — that's talking about what you can secure to officers. So I don't see why, using the words of the Constitution, to secure to authors for a limited time, Congress can't say we want every author to have a limited time. The foreign works that we didn't give, we're not treating them any better. They don't get a different start-up date, but they get the same end date as our own authors. Right. The — the operative language is the limited times restriction. And the limit it requires Congress to pick is the date at which all protection ends for good. And Congress has picked zero since 1790 and respected that decision, and that is no accident. Because the — if you want to know what limited times means, if it means anything, it means if, for instance, if Congress is not required to respect an expiration date long after it's passed or its decision to deny a work any protection in the first place, there's— Ginsburg. We're not talking about expiration dates, so I'd like you to concentrate. That's not — that's not — none of these — none of these copyrights have been extended beyond their expiration date. They just weren't protected. Well, taking works that got no protection, if Congress is not required to respect its decision to deny a work any protection in the first place, we can never know whether we've reached the end or not. And, in fact, that's the problem with the government's theory. Its theory says all Congress has to do is attach a nominal expiration date to any given copyright. Well, if that's true, there is — if that's all you need, there's nothing stopping us from reaching back and giving it a total of 100 years. That is most distinctly not before this case. So please, let's not talk about a copyright that has been protected, has expired, and Congress wants to revive it. We are concentrating on what Congress did to bring us into compliance with the worldwide system, and it's saying we're giving a limited time to these authors. They never had a limited time before. Well, I was talking — de Tocqueville never got any time because he was a foreign author. Ben Johnson never got any time. But on the government's theory, we could give him 100 years right now. This statute did work differently. It certainly restored copyrights into the existing period. That's correct. That is an accurate description of this statute. But that is not a limit that's contained anywhere in the government's interpretation of limited time. Ginsburg. Is there anyone in the same — published the same year as de Tocqueville, a U.S. author that would have a copyright protection today? I'm sorry. I didn't hear you. I gave the example of Aaron Copeland v. Shostakovich. Let's go back to de Tocqueville. Who has the copyright? Who published in what, 18 — what was it? Forties. The answer is nobody, but here's the problem. If Congress wanted to reach that work, here's all it has to do on the government's theory and even under the mechanism of Section 514. All it needs to do today is extend existing terms 100 years and then reach back and restore into that existing term. So on the government's theory and even by the mechanism on which this statute operates, the government could reach back and protect de Tocqueville. Under your — under your theory, let's say you have a copyright that expires on October 5th, okay? On October 4th, Congress could extend that for 25 years. Yes. Right? But on October 6th, they couldn't go back and extend it one day. That's exactly right, because the limit the Copyright Clause requires us to pick is an end date with permanent consequence. End dates are about finality. If that end date doesn't have permanent consequence, if it doesn't have finality, we can never know if we've reached the end or not. The limit the Framers knew was the one in the Statute of Ends. It seems to me that that was rejected in our most recent and earlier case on copyright. In Eldred? Yes. No, no. Eldred said Congress can move the limit back before we reach it, but Eldred most certainly did not say that Congress is free to ignore the limit once we hit it, because if you can do that, then you never know if you've reached the limit or not. The limit the Framers knew was the one in the Statute of Ends. Counselor, there was no limit here, meaning these foreign works were never given the opportunity to be copyrighted. Isn't that a substantial difference from the hypothetical that you're trying to proffer? The hypothetical, and I think that's what Justice Ginsburg was responding to, is you had a copyright, it expired, and now Congress wants to revive it. Isn't that different from not having had the opportunity at all and being given a term to exploit your work and protect it? The answer is no, it's not different. And Congress treated those situations exactly the same in all 19 amendments over the span of 200 years. It gave equal respect. I know, but it didn't do it when it set up the copyright system. Oh, it did. In 1790, Counsel, there were three states that didn't give copyrights. There were other states, and you make a big deal in your brief about common law protection, but common law protection, particularly in New York, which you relied on, only extended to unpublished works. Once a work was published, it was no longer protected under the common law. That was true of most states. And some states gave copyright protection to residents of their own state, but not the rights of residents from other states. So it took a whole body of public works and gave them copyright protection the day they decided to pass the copyright law. So what are you doing telling us that there's never been a historical experience with Congress taking public works out of the public domain? Well, let me be clear about what happened in 1790. The 1790 Act did not remove anything from the public domain. The text is clear because insofar as it applied to works already printed, it presupposes existing copyrights explicitly in the text of the Act. Read those words to me. So I'm looking at section 1 of the 1790 Act. And at the beginning, it talks about after the passing of this Act, the author and authors of any map, chart, book, or books already printed within these United States, being a citizen thereof or resident within, or his or hers executors, administrators, or assigns, who have or have not transferred to any other person the copyright of such map, chart, book, or books. Wait a minute. Who have or have not transferred to any other person. So you don't have to have a copyright. You just you have to have a copyright. You do have to have a copyright. So it says author or authors and half is the singular and half have not is the plural of that. Read it again. Who have. Sure. Or have not transferred to any other person. Right. And the copyright of such map, it presupposes existence of a copyright. Oh, the copyright. I got you. Yes. The copyright is the key language. So the text makes it clear they presuppose existing copyrights. And let me speak to that. Your reading of that passage is different than mine. I think it's a — it's saying whether you have or you haven't. But let me speak to the point you raised about common law protection for published works. You said New York provided no common law protection for published works. With respect, that's not correct. The Naxos v. Capitol Records case, highest court of New York says New York common law provided protection for published works right up to the point where the Federal Act cut it off. And if you look — and if the question is whether the First Congress intended to take anything out of the public domain in 1790, the answer is you simply cannot reach that conclusion because everything contemporaneous with the First Congress, the history of the common law in Britain decided by Millar v. Taylor and Donaldson that the Federalist Papers spoke about common law rights in published works. The Federalist Papers spoke about Millar, and everything contemporaneous said — Sotomayor, if we disagree with your proposition, does your argument fail, if the historical work does not point to what you claim? You mean the 1790 Act or the 19 after it? 1790. If Congress did what I believe it did, does your argument fail? No, I — no, not necessarily, because, of course, that was the first Copyright Act, and Congress established the baseline and had to start somewhere. What we see, 19— You could have started in the place you want Congress to have started now. Well, no, but then— Congress said moving forward, there's a Federal copyright. It didn't have to take things out of the public domain. We're arguing about whether they did or didn't, but assuming they did. Oh, I will assume they did. They had to start somewhere. They wanted uniformity. They created a statute that provided it. When you look at every amendment 19 times in 200 years after that, Congress respected the permanent consequence of the limits it chose. Even when those limits were a work that's no time whatsoever, based on formality and noncompliance, based on national eligibility, based upon expiration of 28 years, it was consistent each time it added subject matter or extended time. Kennedy. Kennedy. Can you tell me a little bit about the phrase and the argument about the public domain? Is, in your view, that just synonym for when the time has ended, or is there something more substantive to it? Is it your position that the public somehow owns what's in the public domain? Well, so, to be precise, our position is once Congress calls the limit, that is, once it says this work is unprotected, whether it's the expiration of 28 years or a decision to give it no protection, it's creating affirmative rights in every member of the public. Yes, they own it. And this Court has recognized that. But how does the phrase – so the public domain is simply a conclusion to express that, the operation of that principle. The public domain doesn't have any more substantive meaning other than to just express the conclusion that there's a limited time. Well, in this case, when I refer to the public domain, it's the collection of things for which Congress had said protection is done, it's over, we've hit the limit, it's done. So things that we've done. Once again, it's just a conclusion for the argument. I think that's the operative concept here. That's right. I think you gave an analogy to the statute of limitations, and I thought you were quite right about that. You can extend the statute of limitations before it's expired, but once it's expired, it's over. The problem, you're using that as an analogy, is that there was a beginning. Time ran out, and you're trying to deal with a situation here where you say, you know, the time was limited for the U.S. work, but it's unlimited, that you cannot treat the foreign work, you cannot give it a limited time, the same limited time that you would give a U.S. work. You're saying these people had no time, and they may never get time. They had no time because Congress decided that their works were going to be ineligible. And a limit of zero is one Congress has been setting since 1790 and respected consistently. If the Chief Justice gives me a limited time for oral argument, I might say, no, thanks. I have nothing to say. And we all know I can't come back tomorrow. But it isn't quite so, because there are the examples of the people who couldn't get copyright because of wartime, both after World War I and World War II. And so those people were allowed to get the protection that they couldn't get because of the war. That's correct. That's what those statutes did. They were never challenged. And make no mistake, our position is insofar as they removed anything from the public domain, they are unconstitutional. But even if the Court doesn't want to go that far, I think the wartime statutes and the other small handful of exceptions the government points to fit quite well into a very limited exception for eligible authors who show nothing more than the familiar concept of excusable neglect, which has operated, again, in very narrow situations to relieve people of the consequences of deadlines. What about new categories, you know, architecture? Congress decides we're going to extend copyright protection to architectural designs, and they say, and we're going to go back five years. So any new architectural design conceived or constructed, whatever, within the last five years gets protection, and it goes on for another 15. Right. So, of course, to be clear, that's not what Congress actually did when it protected architectural works. Look forward. Right. So in that case, the Federal scheme, if it had not previously regulated architectural works, it had not, there had been no decision as to what the limit was going to be. And so you may pose a different question. Here we're talking about works that were affirmatively within the Federal scheme. No, no. I'm just trying to test the limit of your public domain argument. Sure. Does it extend to new categories of copyrightable works? I think the answer is the retrospective portion of that statute flunks progress of science, but passes limited times. Would you spend a little bit of time on your other argument? I take it to be a separate argument, apart from the, you know, time limit argument. The argument that the problem here is that this law does not promote the progress of science and useful arts, and therefore does not comply with the Copyright Clause. That's right. Why doesn't it promote the progress of science and the useful arts? So the progress of science corresponds roughly to the creation and spread of knowledge and learning. A statute that does nothing, like this one, does nothing but take old works out of the world. It does not stimulate the creation of anything. And as for things that already exist, it cannot stimulate the spread of them. All it can do is restrict the spread of things that could once stimulate the creation of them. You don't think that there are some foreign authors who didn't or wouldn't come into the U.S. market because they couldn't protect their works here and kept their works in other markets in which it was protected? Well, I don't, I don't. And it doesn't encourage them to sort of make investments? No. This statute does not and cannot do that because Why not? Foreign authors who decided not to exploit their works here wouldn't be induced to think about coming into this market because now they can protect their works? Well, whether they came into this market or not has no effect on whether they can protect their works or not. They were unprotected. Whether they came into this market or not, they would be protected. You're not answering my question. You don't think that this law induces those foreign authors to come here and promote their work? I don't see how it could. Well, one way it could, I suppose, is that it shows that Congress is interested in making sure that American authors overseas have reciprocal protection, an issue that could come out in a variety of contexts. And if I'm sitting there writing a great novel, I will have the confidence that my government will ensure that I get protection when it becomes a bestseller in China. Yeah. Right? Well, that's an incentive. Yes. And you were assured of that incentive in 1988 when we joined the Berne Convention without removing anything from the public domain. Because when you sit down to write that book today, that work will absolutely be protected in all of the Berne and WTO countries. So the incentive effect was achieved and achieved in full in 1988. No, I'm talking about, but the same issue can come up again, you know, whether it's in the area of formalities or whatever. There may be another problem where there's a dispute between other countries and our country. And I will know that in the past, the United States has taken action looking out for the interests of American authors. That's an incentive. Now, it may be, as I think it was described in a court of appeals decision, a meager incentive. We'd be more interested in other protection. But it's we haven't really required much more than that. Perhaps. I mean, there's nothing in the record before Congress here to reflect the fact they made any such conclusion. Let me put it. I think it's the same point another way. Let's assume I'm a multi-billionaire and I receive an award as a great patron of the arts because I have furthered the arts by giving several million dollars to someone who has already composed an opera or who has already written a book. Wouldn't I be furthering the — be viewed as furthering the arts? Potentially, but the problem here, if I can move a little bit to the First Amendment, is the mechanism Congress chose to use here. They chose to create that reward by taking away core public speech rights from the American public and transforming them into somebody's private property. But that's what the copyright law permits, the — excluding things from the public domain. So long as in the process of doing it, you're furthering the arts. Well, but let me focus on the First Amendment problem. An ordinary copyright statute does not revoke the public's Federal right to copy and print in the public domain. That is exactly the thing Congress refused to do 19 times over 200 years. And that's the huge departure from traditional contours of copyright protection that triggers First Amendment scrutiny here. And when you go to ask the First Amendment question, you can't ignore the mechanism Congress chose to use here, which is to take away public speech rights and turn them into somebody else's private property. That was the explicit motivation of the people who came before Congress and asked them to pass this statute. That is the justification of government. But now you're saying that there is a substantive component to this public domain argument, that the public does own something. And that's different from what I thought you answered earlier when you said it's just conclusory for a limited time. Oh, in that case, I misspoke. The public — the public domain is owned collectively by the public. And, in fact, decisions of this Court going back to the 19th century refer to it as public property. And I think that's true. I'm still curious to go back a second. I thought Justice Sotomayor's question was, imagine Smith in Germany. He has written a book. It's there, already exists. But it has no copyright protection in the United States. So after this, would he be more willing to send it to the United States? And I take it your answer is no. The reason is because I can go and buy a copy and sell it in the United States even without this law. Is that right or wrong? I think — I think that it could possibly incentivize him to bring a work to the United States, depending on how the statute works. Oh, well, see, that's what — isn't that the question? The question is, now that Smith has the same protection in the United States that Germany gave him, doesn't that give him an incentive to send his book to the U.S.? Now, thinking about that one, I thought, not much, because I can go buy it today without this law and bring it to the United States and sell as many as I want. Nonetheless, what is the — that's not right? No, I think you're correct. I think you're correct. I think that's the case. Well, don't just jump on my answer as being correct if it's not. That's what I'm saying. Counsel, it might be his incentive to buy it or not, but the question is the author's incentive to sell it here. Those are two different incentives. Whether, you know, he could go anywhere and buy a cheaper book if he chose to take a trip or get on the Internet and find it, he could do that now. Hot-rated materials here go at a different price than they do elsewhere. That's not the issue. The issue is the author's incentive. The problem here is these authors are long gone. You can't incentivize them. These works are so old, they're long gone. You can't incentivize anything that's happened so long ago. So if you could— Well, if you can't incentivize them, they're not going to claim their rights. I'm sorry? They're not going to come and claim their rights. Part of this law is that they have to declare that they're interested in protecting their copyright here. No, actually, that's optional. It's optional for them to file a notice of intent to enforce. It's optional for them to declare. But the real problem is— Optional for them, but once they do, that's when they can sue a prior user. That's right. Well, it depends who they want to sue, but yes. They certainly have broader rights once they file the notice of intent to enforce. Of course, the assumption of this line of questioning, I suppose, is that the mere marketing in the United States of stuff that has already been created promotes the progress of the useful arts. I'm not sure it promotes the progress of the useful art. It makes more money for the guy who wrote it. But it doesn't incentivize anybody— That's right. —to create art. It's not going to incentivize anybody to create anything, and it only restricts the circulation of things that once circulated freely. If I can reserve my time for rebuttal, I'd like to do that. Thank you, counsel. Thank you. General Verrilli. Mr. Chief Justice, and may it please the Court, I'd like to begin by picking up on a point that my friend made in response to Justice Ginsburg, suggesting that with respect to foreign works, what Congress has done is set the copyright term at zero. I don't really think that's a fair description of the situation. It obscures what Section 514 actually does and what Congress is all about here. Since 1891, Congress has concluded as a matter of copyright law that foreign works are entitled to the same protection as domestic works. The problem with respect to the authors that Section 514 covers is not that Congress set the copyright limit at zero, it's that as a matter of foreign relations, we did not have treaties with these individual countries. And what 514 does is remedy that problem. What 514 says is with respect to a defined set of foreign authors, they get the remainder of the copyright term that they would otherwise have gotten, and nothing more, had they lived in countries where we had copyright — with which we had copyright relations at the time they published, or had they complied with the formalities that we used to enforce, but no longer do, to perfect and renew copyrights. That's what it does. It doesn't grant anybody a perpetual term. It does not renew a copyright term that has run its full course and create a new one. It rectifies that problem, which doesn't — doesn't reflect anything about a congressional judgment setting the copyright term at zero. Could Congress grant copyright protection to works that had lost that protection due to the expiration of the period that was provided for under — then exists under previous law? We think that the — there isn't an ironclad limit that can be derived from the text of the copyright clause or from history that would say that Congress is forbidden in any circumstance from doing that. We do think that there are significant limits in the text of the copyright clause that would restrict any ability Congress might have to do that. But one thing I think is important here is that Section 514 is not a statute in which Congress did that, and we'd respectfully suggest that any assessment by this Court of whether Congress had that power should await a concrete context in which Congress exercised it, if it ever does. That you're referring to? Excuse me, Justice Sotomayor? You said there are limits. Yes. What — what — Well, one limit I think is quite an important one is that the copyright clause says that you can only grant copyright in authors, to authors. And as a work gets older and older, when you're talking about Shakespeare and Ben Johnson, there really at that point isn't an author in which you could vest the copyright. And creating any copyright for a long-expired work like that would really, I think, raise the problem that — that the Framers were addressing by restricting copyright to authors, which is — which was to avoid the creation of patronage monopolies in which publishers who weren't the authors could claim the exclusive rights. Doesn't this — doesn't Section 514 provide copyright protection for works that were created by people who are long since dead? Yes, it does. So I don't understand the limit that you were just suggesting. Well, because — They have to be dead for some period of time before Congress is unable to give them back their copyright, right? What 514 does, Justice Alito, is provide copyright protection to works of foreign authors whose works still have copyright protection in their own country, whether they're dead or alive. So long as the work has protection in — in the country, then 514 provides copyright protection. And the reason it does so is to ensure our compliance with the Berne Convention. And so the why here is very important and I think provides the answer to Justice Scalia's question about how 514 contributes to the progress of arts and sciences. What 514 does — 514 is, in essence, the price of admission to the international system. We decided, the policymaking branches of our government, the Executive and the Congress decided that we needed to be — it was in the national interest to be part of the international copyright system and to join the Berne Convention to accomplish that. The reason we did so was because our intellectual property is subject to very serious levels of piracy in many foreign countries because of under enforcement. By joining Berne, what we did was commit ourselves to the international standards, and by enacting Section 514 to implement the Uruguay Round Agreements in 1994, what we did was say to the world that we are going to ensure compliance in this country. General, really, I — I do not find that an appealing argument. It seems to me Congress either had the power to do this under the Copyright Clause or it didn't. I don't think that — that powers that Congress does not have under the Constitution can be acquired by simply obtaining the agreement of the Senate, the President, and Zimbabwe. I — I do not think a treaty can expand the powers of the Federal Government. I mean, this is either okay under the Copyright Clause or it isn't. It's nice to know the reason for it, but you would still have to establish that it's within the power of the Federal Government. We completely agree with that, Justice Scalia. There is no textual limit in the Copyright Clause that would preclude Congress from enacting this statute. The Petitioners have also raised the First Amendment argument. We don't think First Amendment scrutiny applies here. To the extent it did, the why would matter there, and there's definitely a substantial interest on the part of Congress in — in ensuring compliance with Berne and getting protection for our works in Berne. Now, in Eldred, the Court did say, I think quite clearly, that there is no requirement under the Copyright Clause that a new financial benefit granted to an existing — that a new financial benefit cannot be granted to an existing work. No, but in Eldred, the main difference is that in Eldred, there was a law that might at least in principle have elicited a new book. And in this case, by definition, there is no benefit given to anything at all that is not already created. So by — how does it give any benefit to anything that isn't already created? It creates additional incentives for authors today and going forward because they know that there is a much greater likelihood that whatever intellectual property they create will be better protected in foreign countries as a result of our joining the Berne Convention. How does this provision do that? I think maybe there are other provisions, but I thought this provision is talking solely about books, for example, that are already created. Is it not? I may have been misreading it, but I certainly got that out of like 42 briefs. But we can't get the protections of Berne. Berne is not a menu in which we get to choose options. Oh, you say. Well, as you also know from the 42 briefs, there is a lot of argument that you could or not is that the — there, what you're saying is — if I parody it, it's not a fair reading I'm going to give. But what you're saying is we are here have a law which says that libraries, music lovers, book buyers will either pay more money for things already in existence or will simply be unable to get them if they're orphans. On the one hand, so that other countries will impose similar kinds of restrictions upon their music lovers, music goers, libraries, and so that they pay more for our works that are already in — that are already produced or simply can't use them because they can't find who owns them. Now, that's in parody form for succinctness. What I think the argument is on the other side, and they'll say no copyright law, with your exception of when the country was founded. No copyright law has served that kind of purpose. That's served often by tariffs, but not by copyright law. But there's another way of looking at that, Justice Breyer, of course, which is that the — but for the fact that these individual authors lived in countries that didn't have copyright relations with the United States, they would have the protection of our copyright law, and they would have the term of copyright law. Not necessarily. There are three categories. One is the category of the people who you couldn't because of the country. That's Egypt, I think, and Russia. The second is the category of the people of sound recordings. And the third is the category, which is not the null set, of people who did not comply with certain registration requirements. For example, I believe that the widow of Samuel Britton failed to renew her copyright. And there are probably many that failed to renew the copyright after 28 years, and the reason that they didn't is because they didn't think there was much money in it. And those are the very works that the libraries want to get a hold of and put in their databases. And there is no textual limit in the Copyright Clause that says that Congress cannot provide the same limited term to those categories of works that it provides to other works. There just is no textual limit. That's true but for one text. They say that text has to do with progress. And when they read it historically, in light of McCauley, in light of the statute of Ann, in light of going back to Venice and the copyrights, in light of going back to letters between Madison and Jefferson, that term has always meant produce at least one new thing. And here there is not one new thing. Yes, there is. First, with respect to Section 514, it's part and parcel of joining Byrne. And Byrne gives protection not only to the previously created works, but to newly created works. And it creates additional economic incentives in foreign to by assuring better protection in foreign countries for newly created works. So it creates many, many more than one new work. And I think it's also quite reasonable, Justice Breyer, to read the incentive structure here in a way parallel to the way the Court did in Eldred, which is to say that, just as in Eldred, the Court assumed that there was an implicit guarantee to an author of making a creation, that that author would get the benefit not only of the existing term of copyright, but any extension. I think here, with respect to American authors, it's an implicit guarantee that they get the benefit not only of the foreign protection in existence at the time, but any expansion of foreign protection through joining treaties. And Article 8 and Section 514 implementing Article 18 of Byrne is the price of admission to that treaty system. Roberts. General, there is something, at least at an intuitive level, appealing about Mr. Falzon's First Amendment argument. One day I can perform Shostakovich, Congress does something, the next day I can't. Doesn't that present a serious First Amendment problem? I don't think so, Mr. Chief Justice, and I do think for a host of reasons. One is I think that it's just not so simple. And I think the question that I think Your Honor asked, my friend, was what about when Congress expands the scope of exclusive rights for existing works? Well, Congress has done that many, many times. And musical composition is a really good example of that. In 1831, Congress created exclusive right in the publishing and vending of musical compositions, but not in their public performance. So from 1831 on, once I bought the sheet music, the public performance was, to borrow the Petitioner's way of thinking, in the public domain. You could do it any time you wanted without having to get a license. All right. Well, that's one answer is that Congress has done this before. But then in 1897, Congress granted an exclusive right in the public performance of musical compositions. Right. And made it applicable to all existing copyrights. Do you have an argument other than that they've done this before? Well, that they've done it many times before, and it's a process, I think it reflects, and the point is that no one has thought with respect to any of those significant adjustments of the boundaries that it was an occasion for First Amendment scrutiny. And I think that's because of the wisdom of the Court's opinion in Eldred that these are the people. But it's pertinent under the First Amendment in other areas, right? It's a different analysis if your claim is the government should open up a park as a public forum than if it's been a public forum for 200 years and the government decides to close it down. Maybe they can do it, but it's a different question. So why isn't this a different question from whether they can extend copyright protection that's already there? I think because I think there is once the Court gets into the business of First Amendment analysis, there's no stopping point because all of the adjustments of the boundaries could have the same kind of effect, I think, as the musical composition. Well, what about Jimi Hendrix, right? I mean, he has a distinctive rendition of the National Anthem, and all of a sudden, assuming the National Anthem is suddenly entitled to copyright protection that it wasn't before, he can't do that, right? What copyright does, by definition, is provide exclusive rights in expression. And so if the First Amendment is triggered whenever copyright provides exclusive rights in expression that it didn't used to provide, then heightened scrutiny will apply any time Congress exercises its copyright power. And what the Court said in Colbert's case is that it doesn't apply. But if it works and you have a derivative work or something that is distinctive to you, so those people are just out of luck? Well, of course, under Section 514, they're not out of luck because it has significant protections and accommodations for derivative works. The question of whether there should be heightened First Amendment scrutiny, we think Eldred answers that the copyright clause already contains very significant accommodations of First Amendment interests, the idea-expression dichotomy, fair use, and that is going to provide, maybe Jimi Hendrix could claim fair use in that situation. And those are at the core of the traditional contours of copyright. So if Congress were to try to extinguish fair use, I think, yes, we would have a First Amendment issue there. If Congress were to try to provide an exclusive right in the ideas that are expressed as opposed to the expression itself, yes, we would have a First Amendment issue there. If Congress were to, say, use the copyright power to engage in viewpoint discrimination, it works. Well, it seems to me what you're saying, and I'm glad you gave this answer because originally I thought I was going to put it in my notes, First Amendment doesn't apply to the copyright area. And that just can't be. What you're saying is, is that this law will pass intermediate scrutiny. It's an important governmental interest and it's substantially related to that. We don't think it would have any problem passing intermediate scrutiny, but we don't think intermediate scrutiny ought to apply. Can you cite me some authority which says the First Amendment doesn't apply to a copyright? No. We don't say it doesn't apply, but Eldridge's. The First Amendment test doesn't apply. There has to be a test. Now, maybe you say it isn't intermediate scrutiny. Maybe it's something else. But certainly the First Amendment is implicated. Yes. And what Eldridge said, as I read it, Justice Kennedy, is that unless Congress alters their traditional contours of copyright, then rational basis scrutiny, rather than any heightened form of First Amendment scrutiny, applies. Even under rational basis scrutiny, it seems to me that you run into Justice Breyer's concern that the government interest is vanishingly small when it comes to promoting progress under the copyright clause, so that the interest weighed on the other side of the restriction of free speech rights. It's hard to say that that's necessarily going to tip the balance in every case. I think it is going to tip the balance, Mr. Chief Justice, because the reason Congress enacted Section 514 at the urging of executive branch officials who were charged with trying to ensure that we could integrate ourselves into the international system of copyright protection was that if we didn't have this provision, then we were not going to be taken seriously. Our works were not going to be protected in these foreign countries, and that it would defeat the purpose of joining Byrne in the first place. I couldn't have been. That must be somewhat overstated, mustn't it? Because the only concern is not about protecting new works in the foreign countries. The concern, as I understand it, was that we've had things in copyright for many years and we want retroactive protection there. The countries that didn't give it, like Japan, were not kicked out of the Byrne Convention. Rather, we pursued them in the WTO for many years, and I guess somebody might pursue us, and then you get into an argument about whether there are other ways. Now, is that strong enough to overcome what these briefs are full of? I'll give you an example. Save the Music is charged with looking for Jewish music in the periods 30s, 40s, and 50s. Other organizations might find a treasure trove of literature that was copyrighted in Czechoslovakia or in Warsaw, and they want to put it on the Web, and they want people to listen to it. But they have no more idea of how to track down the person on that, and they aren't protected by any notice requirements because they aren't reliance parties. We're told by Barbara Springer, former Registrar, that there are millions of such instances where people would like to go back and would like to put music, literature, film, et cetera, in a form that people can use it today, and there's no way to do it without their becoming scoff laws or without their having millions of dollars to hire infinite numbers of trackers and lawyers. Now, that's the argument that's made on the other side as the interest in communication that's important. What do you say? Verrilli, So two points. First, with respect to the interest in what foreign countries will do, I think it's incorrect to assume that this will be tit for tat, that if we don't enforce Article 18, the only thing other countries won't do is enforce Article 18 with respect to our works, as opposed to believing that we're not an effective partner in not enforcing their copyright laws for the whole corpus of our works. Second, Justice Breyer, that problem that you identified just exists as a feature of copyright law. Copyright law exists for a certain time. With respect to those works, it's going to create that issue. The problem here is just the result of a fortuity that those works might have been published in a country that at the time they were published didn't have copyright relations with the United States. And what Section 514 does is address that fortuity by putting those authors in the same position they would have been in had their country had copyright relations with the United States. And so I don't think that that's a principled objection on a constitutional basis. Well, here we have ASCAP. We have ASCAP there. I agree with you that it is a general problem. It may be diminished in the United States, but it still exists. And I guess the argument here is, well, don't make it millions of times worse. Well, it doesn't make it millions of times worse. It applies to a small number of, but a significant number of countries. Well, what do you think? Barbara Ringer said a million. She numbers it in the millions. Do you want to say that's a general? No, we don't have any reason to doubt the aggregate number. That's presupposing that they're all going to give notice. Well, with respect to reliance parties, that's certainly true. They would have to give notice. It is the case, Justice Ginsburg, that if you're not a reliance party, then there would be an infringement even without notice. So I do think there is something to that point. But, again, I just think that's a result of the fortuity of the countries not having copyright relations with the United States. It's not about the — it's not anything integral as a matter of constitutional principle of the statute. The library, the day this law was passed, had to go and pick out all the books it had that were subject to copyright and throw them out, or do what with them? I don't think it had to — Stop them from circulation? I'm not sure. How did they protect themselves from infringement? Yeah. And I don't think that they had — I don't think there is an act of infringement by having the library book on the shelf. And, of course, there are protections for libraries built into the Copyright Act in all events. And I do, if I could, in my remaining time — I want to go back to the history that we started with, because I do think it is important that there is no — as a matter of — as a matter of text, I think it's clear there is no unyielding requirement that you cannot restore copyright to works in the public domain. I think the history really does bear that out. I think Justice Sotomayor had the history exactly right, that in 1790, you had three States with no copyright statutes. Of the ten States with copyright statutes, you had seven that did not provide copyright to maps and charts, which the Federal statute did. And I think this is the key point. Of the States that did enact copyright statutes to — in the 1780s, in advance of the 1790 Federal Act, at least four, and depending on how you count it, as many as eight, provided copyright protection only to works printed after the date of the State statute. They did that at the urging of the Continental Congress in 1783. So I don't think there's any doubt that when Congress enacted the Copyright Act in 1790, it made a conscious choice to take a different approach to grant copyright protection to existing works, including many, many, many works that were freely available for exploitation in those States. But doesn't that show at most that retroactive protection can be granted when there is an enormous interest in doing so, namely the establishment of a uniform copyright system at the beginning of the country? Because if Congress had not done that and had said the alternative would be to say things can be copyrighted going forward, then you would have different copyright laws in all the States. I think — I don't think so, Justice Alito. I think they could have followed the model nationally of prospective copyright only and extinguishing the prior copyright. Right. And — but they didn't make that choice. They made a different choice. Now, my friend suggests that the 1790 Act was just a transition. But, of course, the same thing is really true in an important sense of Section 514. It's part of a tradition — of a transition of the United States into the international system, which has required an adjustment of our rules in order to bring us into conformity with the international system. And beyond the example, of course, of the 17 — and, by the way, with respect to that language in the 1790 copyright who hath or hath not hath copyright, that's just a rerun of an argument that the Court rejected in Wheaton v. Peters. In Wheaton, the Court said that that language in the 1790 Act was referring to prepublication common law copyright, not postpublication common law copyright. Beyond that, it seems to me pretty clear that what that language is referring to — of course, Congress presupposed the existence of copyrights. There were all these State statutes that created some copyrights. But what Congress did was act far more broadly. And so I do think — and then when one looks at the examples of patents, and I think the Oliver Evans example and that case is an important example. Early in our history, Congress creates a new patent term to an expired patent. President Jefferson signs it. Secretary of State Madison issues it. Chief Justice Marshall upholds it as a circuit justice. And the Court upholds it against a charge that it's impermissibly burdening people who act in reliance on the expiration of the prior patent. There wasn't a word in this Court's decision in that case about any potential constitutional infirmity with doing that. And one would think if this was such a significant and viable principle of constitutional law, that someone would have brought it up in those cases. And in fact, the striking thing about reading the Evans decision is that the Court clearly looks at this all as a matter of legislative policy judgment. It says, you know, yes, you're right, it might have been an argument, a good argument in favor of creating some reliance interests here, but that's a judgment Congress should have made if anybody was going to make it. It didn't. And there is no reading of the — there's no required reading of that statute that has to protect the Reliance Party. So I don't — I just think when you look at the patent protection, when you look at the 1790 Act, when you consider the fact that when Congress expands exclusive rights as it did, for example, with respect to musical compositions, but did in the 1976 Act with respect to lots of exclusive rights, it does so with existing copyrights, and all of that points up the wisdom of what this Court said in Eldred, that within very wide margins, these are matters for legislative choice. These are policy calls that require the balancing of a complex set of interests, the drawing of a complex set of lines made even more complex by virtue of the fact that we are now trying to make a transition into full participation in an international system, which is of vital importance to protecting one of our most valuable economic exports, intellectual property. Thank you. Roberts. Thank you, General. Mr. Feldsohn, you have four minutes remaining. Thank you. I have four points to make. First one, refusing to provide any protection for work is setting the term at zero. The point of the limited times restriction is it — excuse me — it forces Congress to tell us when the end has come. And if Congress is forever free to change its mind, then we can never know if the end has come. Point number two, this statute does not and cannot promote progress, that is, the creation and spread of knowledge and learning. When we joined Byrne in 1988, we got all of its prospective benefits, or as the government put it, secured the highest available level of multilateral copyright protection for U.S. artists, authors, and their creators. This statute is not about that. It's simply about rewarding people who made things long ago. At the time we joined Byrne, there was an appreciation that we deferred the Article 18 issue. There wasn't any — anyone who said that we satisfied it. No. There was an explicit finding written into the statute that — and Congress found explicitly that we could comply with all Byrne obligations without removing anything from the public domain. Now, third point. Well, there are many people who read Article 18 in a different way, and Congress was later persuaded. That that was right. Congress never revisited that finding, so no. They found what they found in 1988, and they never revisited it. They found that compliance with Article 18 was appropriate for us to become a full member of the international copyright community. Congress did not make that finding, and I don't think you can even glean that from the testimony that was presented to Congress. The problem here is the right to use works in the public domain has defined the freedom of speech that the public has known since 1790. The 1790 Act made these freedoms clear by placing works unambiguously and clearly in the public domain, including all foreign works. So even since before we had a First Amendment, that has defined the freedom of speech that the public knew. And that right has also made sure that the copyright sequence provides ever-increasing protection for public speech rights. It gives partial protection for some public speech interests during any initial period of protection, but that blossoms into complete protection for all public speech interests once we reach the limit Congress picks, once they place the work in the public domain. The burden on speech that this statute imposes is remarkable. Let's start with the performance right, which is central to my clients. There can't be any doubt, as I think Chief Justice Roberts got it, that the performance has a huge amount of original expression bound up in it. It's the reason it's different to see King Lear at the Royal Shakespeare Company. It's the reason it's different when John Coltrane plays a jazz standard. Huge amount of expression. But even if you put performances aside, this Court has recognized in case after case that there is a critical speech interest in publishing the work of another author, in showing a film created by another, or for that matter performing the work of another. So the burden here is it took speech rights of 250 million Americans and turned them into the private property of foreign authors, all on the bare possibility that might put more money in the pocket of some U.S. authors. All this rides on accepting your argument that zero is a limited time. No, not on the First Amendment side. Not at all. No, no, no, no. No, that is, the First Amendment argument is completely independent of that. Even if you find Congress could do this on the Copyright Clause, we still have that First Amendment problem. And the — there is no way the government can pass intermediate scrutiny here. This was not required by Byrne. The government does not even contend Section 514 was required by Byrne, nor could it, because that would violate Congress's explicit findings. They made 1988. Would you say it was required by TRIPS? No, because TRIPS just implements Byrne. So the problem here is this statute was not passed. Is it not so that if we don't comply with Byrne 18, then we are subject to being sanctioned by some World Trade Organization? There was very vague testimony about the unsupported possibility that could happen, and that's why the government falls back on this interest of avoiding a dispute. Here is the problem. If the government can get around First Amendment limits by signing a treaty, and then the flexibility to take away public speech rights is defined by some complaint proffered by some treaty partner, then the First Amendment is defined only by the perceptions, the complaints, and, frankly, the imagination of foreign countries. That can't be the way it works. Thank you, counsel. Counsel, the case is submitted.